# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No.    21-cr-00029 (TSC) |
| HUNTER ALLEN EHMKE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

. . . [A] riot is a case of destructive violence that involves a great number of otherwise quite normal people who would not usually be disposed to violence . . . [it's] a mistake to focus on the decision-making processes of each rioter in isolation . . . a riot [is] not a collection of individuals, each of whom arrive[] independently at the decision to break windows. A riot [is] a social process, in which people d[o] things in reaction to and in combination with those around them. Social processes are driven by our thresholds— . . . defined as the number of people who need to be doing some activity before we agree to join. . . riots [are] started by people with a threshold of zero —instigators willing to throw a rock through a window at the slightest provocation. Then comes the person who will throw a rock if someone else goes first. He has a threshold of one. Next in is the person with the threshold of two. His qualms are overcome when he sees the instigator and the instigator's accomplice. Next to him is someone with a threshold of three, who would never break windows and loot stores unless there were three people right in front of him who were already doing that—and so on up to the hundredth person, a righteous upstanding citizen who nonetheless could set his beliefs aside and grab a camera from the broken window of the electronics store if everyone around him was grabbing cameras from the electronics store.[1]

---

[1]    *See* Malcolm Gladwell, *Thresholds of Violence*, The New Yorker (Oct. 12, 2015), available at https://www.newyorker.com/magazine/2015/10/19/thresholds-of-violence.

## Introduction

On May 13, 2022, Mr. Hunter Ehmke, pursuant to a guilty plea, will appear before this

Court to be sentenced for Destruction of Government Property, in violation of 18 U.S.C. § 1361.

Mr. Ehmke respectfully requests, after considering all the relevant sentencing factors, including

18 U.S.C. § 3553(a), the Court impose a sentence of probation, with the additional conditions of

$2,821 in restitution, and enrollment and completion of mental health and substance abuse

treatment.

## RELEVANT FACTS AND BACKGROUND

On December 19, 2020, following his loss in the 2020 presidential election, then-

President Donald Trump announced a "Save America" rally to protest the results.[2]  The rally was

set for January 6, 2021, the same date Congress was set to certify President Joseph Biden as the

winner.

On the morning of January 6, 2021, attendees gathered at the Ellipse in anticipation of the

rally's start.[3]  A number of speakers took to the stage, including some high-profile figures in the

Republican Party.  Representative Mo Brooks (R-Ala.) urged "American patriots" to "start

taking down names and kicking ass."[4]  Katrina Pierson, President Trump's spokesperson during

---

[2]     President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on
January 6th . . . Be there, will be wild!"  *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be
Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at
https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

[3]     Though President Trump boasted that the rally numbered "hundreds of thousands of
people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's
What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5,
2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-
pro-trump-rallies-that-have-permits/.

[4]     *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12
people who spoke before him?*, Politico (Feb. 10, 2021), available at

his 2016 campaign, stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or we will go after them."[5]  Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and "punch back from Donald Trump."[6]  Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees to march on the Capitol to "stand up for this country and stand up for what's right."[7]  Donald Trump, Jr. narrated that "You have an opportunity today: You can be a hero, or you can be a zero.  And the choice is yours but we are all watching."[8]  Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "trial by combat."[9]

Finally, around noon, President Trump took to the stage.  For an hour, he bemoaned the election results, imploring attendees to "fight" for him:

---

https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[5]     *Id*.

[6]     *Id*.

[7]     *Id*.

[8]     *Id*.

[9]     *Id*.

We will not let them silence your voices. . . we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen. . . And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.[10]

At approximately 12:30 p.m., even before President Trump concluded his speech, some of the rally attendees migrated from the Ellipse toward the Capitol.[11]  At approximately 12:50 p.m., some of those same attendees breached the outer barricades of the U.S. Capitol grounds.[12] The U.S. Capitol Police officers, who had been stationed behind the barricades, retreated and called for backup from the Metropolitan Police Department (MPD) and National Guard.[13]  The MPD arrived approximately 15 minutes later, mobilizing and moving from the South of the building to the West.  But the National Guard did not respond for nearly four hours, during which time clashes between the first wave of protestors and police intensified.[14]  Eventually, at 2:13 p.m., the Capitol itself was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building.  This breach spurred the evacuation of

---

[10]     *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[11]     *See* Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; *see also* Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

[12]     *Id.*

[13]     *Id.*

[14]     *Id.*

members of Congress and the Vice President, who at the time, were debating congressional challenges to the Electoral College results.[15]

Contemporaneous with the Senate Wing Doors' breach, a 20-year old Mr. Ehmke, among other individuals, climbed the steps to the Rotunda landing.  Once on the landing, Mr. Ehmke clambered up the ledge of a multi-pane window that opened to an interior office.  At approximately 2:15 p.m., Mr. Ehmke used his fist to break multiple lower panes of the window. When an officer witnessed the destruction, he charged at Mr. Ehmke, striking him with a police shield and knocking him to the ground.  As Mr. Ehmke lay face-down, officers pulled his arms behind his back and placed him in handcuffs.

However, just as officers brought Mr. Ehmke to his feet, other individuals of the mob surrounded and angrily screamed at the officers.  The officers, being woefully outnumbered, made a judgment call.  They asked Mr. Ehmke for his driver's license and when he complied, the officers removed his handcuffs, told him to leave, and warned him that criminal charges would be forthcoming.  Mr. Ehmke immediately left the Capitol grounds, having never gained entry to the building.

Just five days later, on January 11, 2021, armed with Mr. Ehmke's bequeathed identification, the government filed a criminal complaint against him, alleging Destruction of Government Property, in violation of 18 U.S.C. § 1361; Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) and (G).  *See* ECF No. 1.  On January 13, 2021, Mr. Ehmke was arrested in his home jurisdiction of California and subsequently released

---

[15]     *Id*.

on a $40,000 appearance bond.  *See* ECF No. 8.  On January 21, 2021, Mr. Ehmke had his initial

appearance in U.S. District Court for the District of Columbia and Magistrate Harvey released

him on his personal recognizance, subject to conditions, including global positioning system

(GPS) monitoring.  *See* ECF No. 5.  On January 27, 2021, the government filed an indictment

against Mr. Ehmke, alleging the same charges as the earlier criminal complaint.  *See* ECF No. 6.

On January 14, 2022, this Court reviewed and accepted Mr. Ehmke's guilty plea to Count

One of the indictment, to wit: Destruction of Government Property.  *See* ECF Nos. 21-23.  The

government agreed to dismiss the remaining charges at sentencing.  *Id*.   As part of his plea

agreement, Mr. Ehmke and the government agree that under the 2021 U.S. Sentencing

Commission, Federal Sentencing Guidelines Manual (the "Guidelines"), Mr. Ehmke's base

offense level, after all adjustments is 4.  *Id*.  Because Mr. Ehmke has no criminal history, the

parties further agree that his Criminal History Category is I, suggesting a Guidelines range of 0

to 6 months of incarceration.  *Id*.  After acceptance of his plea, this Court referred Mr. Ehmke to

the U.S. Probation Office for a Presentence Investigation and subsequently set his sentencing for

May 13, 2022 at 10:30 a.m. via video conference.

## LEGAL PRINCIPLES

Federal law expressly favors liberty over incarceration insofar as the purposes of

promoting correction or rehabilitation are concerned. To that end, 18 U.S.C. § 3582 states:

> The court, in determining whether to impose a sentence of imprisonment, and, if a term
> of imprisonment is to be imposed, in determining the length of the term, shall consider
> the factors set forth in Section 3553(a) to the extent that they are applicable, **recognizing**
> **that imprisonment is not an appropriate means of promoting correction and**
> **rehabilitation.**

(Emphasis added.)

Under § 3553(a), the Court is directed to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of [sentencing]." Such factors include the "nature and circumstances of the offense and the history and characteristics of the defendant and the need for the sentence imposed." 18 U.S.C. § 3553(a). To determine the "need" for the sentence, the Court should consider if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." *Id*. at 2(A). Additionally, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id*. at 2(B-D). Further, the Court must be mindful of "the kinds of sentences available" and the Guidelines and policy statements issued by the Sentencing Commission, including the indicated Guidelines range. *Id*. at 3-5.

## ARGUMENT

A sentence of probation, consistent with the low end of Mr. Ehmke's Guidelines range, would be fair and just given the factors set forth under 18 U.S.C. § 3553(a). Though the nature of Mr. Ehmke's offense is serious, as is the Court's duty to provide general deterrence, those factors do not outweigh Mr. Ehmke's personal history and characteristics. Further, Mr. Ehmke's arrest, subsequent pretrial supervision, and the inevitable collateral consequences that will stem from this conviction are, and have been, sufficient motivators to not re-offend. Moreover, Mr. Ehmke's rehabilitative programming plan is best supported outside of prison walls.

I. **The Nature and Circumstances of Mr. Ehmke's Offense Are Serious, but Not Inapposite to a Probationary Sentence**

The events of January 6 cannot, and should not, be minimized. When protestors unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through

windows and doors, over 100 law-enforcement officers were injured and the U.S. Capitol

Building sustained $2.73 million in property damage.[16]  Five individuals lost their lives.[17]  And

because of the breach, the 2020 Presidential Electoral College count was delayed.  All of these

casualties and disruptions exacted a toll on Americans: some lost family members, some lost

friends, and many lost confidence in the American political system's ability to defend against

threats to the peaceful transfer of power.

Taking that into account, and without minimizing Mr. Ehmke's actions that fated day,

Judge Mehta stated, during a similar January 6 sentencing,

> There is some mitigation here.  [The Defendant] didn't plan this episode, he didn't
> purposely come to Washington, D.C., to storm the Capitol. The fact remains that he and
> others were called to Washington, D.C., by an elected official, told to walk to the Capitol
> by an elected official. . . People [] were told lies, falsehoods, told the election was stolen
> when it really wasn't. . . I think you are a pawn . . . You are a pawn in a game that's
> played and directed by people who should know better.[18]

Similarly, Mr. Ehmke, also fed lies and disingenuous directions by people that should have

known better, has some mitigation.  He was not the cause of January 6, nor was he in the

classification of people that caused physical injury to others.  He did not come to Washington,

---

[16]    *See* Zachary Snowdon Smith, *Capitol Riot Costs Go Up: Government Estimates $2.73
Million In Property Damage*, Forbes (Apr. 8, 2022), available at
https://www.forbes.com/sites/zacharysmith/2022/04/08/capitol-riot-costs-go-up-government-estimates-273-million-in-property-damage/?sh=4d4716f519c5.

[17]    Ashli Babbitt was killed after she refused to comply with police commands.  Kevin
Greeson and Benjamin Philips died of unrelated, but perhaps exacerbated, medical conditions
while in the crowd.  Rosanne Boyland was crushed to death.  Officer Brian Sicknick died the day
after, from injuries that appear related to his service on January 6.  *See* Jack Healy, *These Are the
5 People Who Died in the Capitol Riot*, The New York Times (Jan. 11, 2021), available at
https://www.nytimes.com/2021/01/11/us/who-died-in-capitol-building-attack.html.

[18]    *See* Steve Benen, *Judge blames Jan. 6 on Trump, tells rioter he was 'a pawn'*, MSNBC
(Nov. 22, 2021), available at https://www.msnbc.com/rachel-maddow-show/judge-blames-jan-6-trump-tells-rioter-he-was-pawn-n1284327.

D.C. with the intention to subvert democracy. Though his conduct was indeed serious, it cannot be conflated with the many other, wider, failures that occurred that day.[19] And it should not be used as a proxy for those, including the former president, the rally's organizers and speakers, and other nefarious, organized groups, that arguably bear much greater responsibility for what happened on January 6.

Turning to Mr. Ehmke's conduct specifically, he traveled alone from his home in Glendora, California to Washington, D.C., with the intention to sightsee at the nation's capital and witness a sitting president speak. His mother, just one week before the destined day, agreed to fund his trip, believing it would be a good exercise in civil education. On December 30, 2020, she purchased his airfare and accommodations for a week-long stay. Neither Mr. Ehmke, nor his parents, had any idea that the rally scheduled for the middle of his trip, on January 6, would take the turn it did.

On the morning of January 6, Mr. Ehmke made his way to the Ellipse. He watched as President Trump, along with other speakers, lamented the election results. He saw members of the crowd begin to march towards the Capitol building upon the direction of the speakers. And he followed.

Caught in adrenaline, chaos, and the comradery of the crowd, Mr. Ehmke entered the restricted grounds of the U.S. Capitol Building and made his way up the Rotunda's grand outside

---

[19]     There are a variety of factors that led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency." *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

staircase.  Once on the landing, Mr. Ehmke climbed the ledge of a nearby window.  Cheered on

by the crowd below, Mr. Ehmke used his fist and feet to smash the window's lower panes.

Officers, holding a riot line nearby, witnessed the damage and ran to Mr. Ehmke.  One officer

struck Mr. Ehmke on his lower torso and legs, attempting to knock him off the ledge.  Mr.

Ehmke fell, was pushed face down on the landing, and restrained.  After securing him in

handcuffs, officers brought him to his feet.

However, upon his restraint, members of the crowd that had previously cheered Mr.

Ehmke on, who were wholly unknown to him, encircled the arresting officers.  They began

screaming, "He's not going to jail!", "You're not taking him!", and "It's not happening today!"

The officers, in an attempt to protect themselves, the building, and Mr. Ehmke, asked Mr. Ehmke

for his name and identification.  Mr. Ehmke honestly answered and handed the officers his

California driver's license.  The officers then un-cuffed Mr. Ehmke and told him to leave

immediately.  Mr. Ehmke did so, and after clearing the Capitol grounds, called his mother in

tears.  After multiple attempts to calm him and understand what had just occurred, his mother

told Mr. Ehmke to return to his Airbnb.  Mr. Ehmke followed his mother's direction, found his

way back to the Airbnb and locked himself inside.  He did not emerge from his lodgings until

January 8, when he left for the airport and returned to his family home in California.

Then, on January 13, 2021, when FBI agents arrived at Mr. Ehmke's grandparents' home,

a house adjacent to his parents, Mr. Ehmke was cooperative when they took him into custody.

After his initial appearances, Mr. Ehmke remained cooperative and largely compliant with the

terms of his release conditions, including GPS monitoring.[20]  At the first opportunity to take responsibility for his actions, Mr. Ehmke did; he never wavered.

Moreover, Mr. Ehmke's offense conduct is limited in its scope and influence.  Though he broke the window panes of a historic and democratically significant institution, his crime ended upon his withdrawal from the Capitol grounds.  There is no evidence that the window Mr. Ehmke damaged was used by others to make entry into the Capitol.  He played no role in organizing January 6, nor did he deliver inciting and aggressive commentary to an already energized crowd.  He urged no one to "kick[] ass," "go after [politicians]", "punch back from Donald Trump" or engage in "trial by combat."  Mr. Ehmke never entered the building, stole property, or assaulted or threatened law enforcement.  He did not bring any weapons with him, had no connection to extremist groups, and never attempted to blame the media or spread disinformation online.  Mr. Ehmke did not gloat, brag, or condone what others did that day.  In sum, Mr. Ehmke committed a serious offense, but it was non-violent, limited, and finite.  A sentence of probation with conditions, a sentence supported by his estimated Guidelines range, is sufficient to account for this serious conduct.

## II.    The History and Characteristics of Mr. Ehmke Support a Non-Custodial Sentence

Born in 2000, Mr. Ehmke is the eldest child and only son of his parents, Lisa and Aaron. His hometown, Glendora, sits directly between Los Angeles and San Bernardino in California. Though California's national politics trend blue, San Bernardino, a city widely considered to be the capital of California's Inland Empire, is decisively conservative.  His parents, high school sweethearts that also grew up in Glendora, are conservative, as are his grandparents.  His mother,

---

[20]     The one exception was in October 2021, when Mr. Ehmke was verbally reprimanded by this Court for visiting a firearm range. *See* ECF Nos. 17 & 18.  However, to date, Mr. Ehmke has incurred no other infractions.

staunchly supportive of her son and hometown, totes that Glendora is a wonderful place to raise

a family.  Mr. Ehmke's immediate and extended family are incredibly close; his parent's home is

next door to his grandparents.[21]



---

[21]     *See* Ex. A: Character Letters on behalf of Hunter Ehmke.

[22]     *See* Ex. B: ██████████████████████████████████
██████████ filed under seal.

[23]     *Id*.

[24]     *Id*.

[25]     *See* Ex. C: ████████████████████████████████████ filed under seal.



---

█████████████████████████████████████████████████

████████████████████ [31]

It was during this time that Mr. Ehmke began to experiment with drugs, ████████████

███████████████████████████████████████████████████

█████████████████ He smoked marijuana constantly and attempted to become an expert on the

plant.  He experimented and became infatuated with psychedelics.  These substances impaired

his schooling, and his parents took note.  However, though worried about their son's substance

abuse, both his mother and father fought their own demons: ██████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

Despite his drug use, Mr. Ehmke eventually earned his high school diploma in 2019.

After graduating, and unsure of whether to continue his education, Mr. Ehmke enrolled in a

traveling cultural exchange program referred to as Leap Year Program.  His parents financed the

endeavor, believing that even if Mr. Ehmke was not interested in traditional higher education, his

exposure to travel and different cultures was its own form of valued "life education."  Mr.

Ehmke traveled alone through this program, spending about three months in Costa Rica and

Peru.  He also traveled on his own to Portland and Seattle.  ██████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[31]     *See* Ex. E: ████████████████████████████████, filed under seal.





41    *Id.*

42    *Id.*



---

43      *See* Ex. B at 4.

44      *Id.*

45      *Id.*

46      *See* Malcolm Gladwell, *Thresholds of Violence*, The New Yorker (Oct. 12, 2015), available at https://www.newyorker.com/magazine/2015/10/19/thresholds-of-violence.



supra note 1.

[47] ███████████████████████████

[48] ███████████████████████████

[49]    *Id.*

[50]    *Id.*

███████████████████████████████████████   Additionally, while

on pretrial supervision, Mr. Ehmke went back to school, enrolling at a local community college,

Citrus, where he takes a full load of college courses.  His confidence has improved

tremendously, and one of his professors even nominated Mr. Ehmke for an academic

scholarship.  Integral to his continued success, Mr. Ehmke has not used any drugs or alcohol

since November 2020.  He works part-time for his parents' business and volunteers at a local

food bank.  His mother noted that he:

> . . . is in such a different place than he was last year at this time. As his mother it brings me
> inner peace and joy to see him thriving. Obviously this looming situation is debilitating, but
> I'm looking at the silver lining in it all.

As this Court has noted in so many different sentencings, Mr. Ehmke is more than his

actions on January 6.  He is a loving son ████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

However, now sober, receiving proper treatment, and in higher education, Mr. Ehmke is building

a life worth living.  He implores the Court to not crumble the progress he has made since his

arrest with the imposition of a custodial sentence.

## III.   The Need for Deterrence Has Been Fulfilled

Mr. Ehmke has been on pretrial release for 16 months.  He has lived with a GPS monitor

affixed to his ankle, unable to travel, and reminded of his actions on January 6 each time he

wraps his ankle in plastic before showering.  His family has endured public shame and

embarrassment and he has felt an almost constant stress about an impending prison sentence.

Additionally, Mr. Ehmke will come away from this case, regardless of the sentence imposed, with a felony conviction.  And since it's a federal felony, he will carry it for *life*; there is no expungement in the federal system.  That means Mr. Ehmke, even decades from now, may be forced to disclose that he was convicted of destroying government property, a charge that many employers and loan providers may deem grounds for termination or disqualification.  As this Court has noted in another case, individuals with felony federal convictions:

> . . . frequently encounter barriers to employment, such as difficulty obtaining certain professional licenses, as well as other collateral consequences. Indeed, scholars and legislative associations have written extensively about this problem—and possible solutions. However, absent statutory authority, [courts have] limited power to expunge criminal convictions, and the broader problem of undue collateral consequences remains an issue to be addressed by the legislative branch, if and when they choose to do so.[51]

As a young man just starting his life, being marked with a felonious scarlet letter will not help him succeed.  The addition and trauma of a custodial sentence will only further act as a barrier to productivity.  His own tears and regret, his family's shame, and his felony conviction with supervision, are enough; Mr. Ehmke needs no further specific deterrence.

As for general deterrence, sentencing Mr. Ehmke to incarceration is not the salve the country needs to ensure January 6 was an isolated horror.  The events of January 6 are unlikely to happen again,[52] and even if they did, those that would participate will not be deterred by the prison sentence of an obscure 21-year-old from Glendora, California.  Further, even if future, hypothetical insurrectionists were capable of deductive reasoning, empirical evidence proves that *certainty* of prosecution, rather than *severity* of punishment, is the greater deterrent:

---

[51]   *See United States v. Shelia Denise Graham*, Crim No. 85-cr-186, ECF No. 6.

[52]   *See* Transcript of Video Sentencing in *United States v. Douglas Sweet*, 21-cr-00041-3, ECF No. __ at 45-47.  (The Honorable Nichols stated, "It is unlikely that the circumstances that led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crowd, to protest and demonstrate, even fight at the Capitol . . .").

> [I]t is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment.  Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.[53]

To its credit, the Justice Department moved swiftly after January 6, displaying a self-titled, "shock and awe" campaign of criminal prosecutions for those that participated.[54]  However, the Justice Department and its law enforcement agencies, in its fervor, neglected to charge the most culpable – namely those that organized and incited the event.  This is important because the types of individuals willing to participate in a government coup are likely only to be deterred if the individuals culpable for the earlier coup, meaning the organizers and executors of January 6, face criminal charges and incarceration.  Attempting to extract lengthy incarceration sentences for those already charged and convicted, like Mr. Ehmke, will do nothing to provide the needed general dissuasion the government and country seek.

IV.   **The Need for Rehabilitative Treatment and Programming Is Best Provided Outside of Prison**

Since his arrest in this case, Mr. Ehmke has made great strides in becoming a more productive member of society. ███████████████████████████

████████████████████████████████████████████

---

[53]    *See* National Institute of Justice, *Five Things About Deterrence* (Jun. 5, 2016), available at  https://nij.ojp.gov/topics/articles/five-things-about-deterrence#:~:text=Certainty%20has%20a%20greater%20impact,only%20a%20limited%20deterrent%20effect.

[54]    *See* Scott Pelley*, Inside the Prosecution of the Capitol Rioters*, CBS News (Mar. 22, 2021), available at https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/.

 He began community college and now takes a full course-load.  He has maintained his sobriety, works part-time at his parent's business, and volunteers at a local food bank.  In other words, Mr. Ehmke, just by virtue of this case, has taken it upon himself to reform and better his life.  Sending him to jail now will do nothing but disrupt that progress and perhaps, inflict real damage to his respect for the law.









**Conclusion**

January 6, 2021 was a horrifying day for many who watched it unfold, whether on television or in-person.  But Mr. Ehmke, despite his presence within the crowd and his participation in destruction, was not a malicious actor who engaged in the outrageous conduct for which the day will be remembered.  He did not organize nor incite the riot, nor did he physically harm any person.  Though Mr. Ehmke certainly deserves some punishment for his conduct, it must be weighed against his lack of criminal history, his other history and characteristics, and his out-of-custody capacity for rehabilitation ████████████████████████.

---

63 ████████████████████████████████
████████████████████████████████
██████████

After considering all the factors mentioned above and other considerations under 18

U.S.C. § 3553(a), a probationary sentence, with the additional conditions of $2,821 in restitution,

and enrollment and completion of mental health and substance abuse treatment is sufficient, but

not greater than necessary, to comply with the purposes of sentencing.


Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
CARA HALVERSON
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Cara_halverson@fd.org

26