**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**HUNTER EHMKE,**<br><br>                    **Defendant.** | **Case No. 21-cr-00029-TSC** |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Hunter Ehmke to 4 months' incarceration, three years of supervised release, $2,821 in restitution, and the mandatory $100 special assessment.

## I.      INTRODUCTION

The defendant, Hunter Ehmke, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

On January 14, 2022, Ehmke pled guilty to Count One, felony Destruction of Government

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Property in violation of 18 U.S.C. § 1361. As explained herein, a sentence of 4 month's imprisonment, with a three-year term of supervised release to follow, is appropriate in this case because Ehmke smashed a set of windows on the east front of the Capitol Building by kicking and punching them while at the forefront of the mob attacking the Capitol on January 6, 2021. Ehmke, a 20-year-old California resident, traveled to the District of Columbia to attend the Stop the Steal rally. Ehmke travelled with the crowd from the rally to the Capitol, and joined them as they ascended the Rotunda Steps on the East Side of the Capitol. He then climbed a windowsill and began kicking and punching windowpanes out of a Capitol window. He was tackled by the police, who took his identification, and he subsequently left the Capitol Grounds after being told that a warrant would be issued for his arrest.

The Court must consider that Ehmke's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). The government recommends that the Court sentence Ehmke to 4 months' incarceration, which is within the advisory Guidelines' range of 0-6 months. A 4-month sentence reflects the gravity of Ehmke's conduct, but also acknowledges his admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The day started out calmly enough. As set forth in the PSR and the Statement of Offense incorporated into Ehmke's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police

were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 2-9; PSR ¶¶ 18-24.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at

14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and

photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### B.      Ehmke's Role in the January 6, 2021 Attack on the Capitol

Hunter Ehkme, a 21-year-old California man, participated in the January 6 attack on the Capitol.   On January 5, 2021, Ehmke traveled from California to Washington, D.C. where he stayed in an AirBnb, to attend the "Stop the Steal" rally. On January 6, 2021, Ehmke made his way from the rally as part of a large mob that gathered on the East Side of the Capitol Building near the Rotunda Door.

Inside those doors, at about 2:24 p.m., a rioter approached the eastern Rotunda doors and used his shoulder to force them open. A single person tried to stop the rioters from entering, but he was overwhelmed by other rioters inside the building and forced away from the door. After rioters inside forced the door open—a feat made more difficult due to the size of the crowd outside—they pulled a police officer through the door, then worked to clear a logjam of bodies outside. Moments later, rioters outside began to pour into the Capitol building.   Outside, the crowd cheered enthusiastically when they saw the door had been forced open. As rioters in front of the door poured in, other members of the crowd moved closer to the front.

Shortly before this breach, Ehmke made his way up the Rotunda steps, and approached an unguarded and accessible window with multiple panes that led inside the building at approximately 2:15 p.m. At the time Ehmke moved toward the window, the Capitol Police were holding back the mob from breaching the Rotunda Door, but the window to the right of the door on the terrace was unguarded by the outnumbered law enforcement. The below photo shows the unguarded window Ehmke approached circled in red, with the Rotunda Door behind the columns to the left.



After approaching the unguarded window on the terrace, Ehmke jumped up on the window ledge.   A Capitol Police Officer, who was at that time using his shield to hold back rioters from the Rotunda Door, saw Ehmke standing on the window ledge.   He saw Ehmke twice wave his

hand drawing the attention of the mob to the unguarded window.

Ehmke then began to systematically kick in the three lower panes of the window, shattering each in turn.   *See* Exhibit 1 (video of Ehmke breaking window and interaction with law enforcement).   Ehmke punched two additional window panes above the lower panes he had just kicked out.   The below images are video stills from Exhibit 1 that show Ehmke, wearing a dark grey jacket and green hat, kicking and punching the Capitol window.

 

8

 

Capitol Police saw that Ehmke was punching the unguarded window and rushed to stop him.   Ehmke was pushed to the ground of the terrace by Capitol Police and detained, after which the officers took his California Driver's license and identified him.

The crowd became increasingly aggressive toward the Officers who had detained Ehmke. One man yelled that they weren't going to the let the officers leave with the then handcuffed Ehmke.   As a result, the Officers took Ehmke's identification and told Ehmke to immediately leave the Capitol grounds and that a warrant would be sought for his arrest.

Below is a photo of the window after Ehmke kicked and punched the window panes. Officers do not recall any damage to the window before Ehmke approached it.



Ehmke departed the area and ultimately returned to California on January 8, 2021.

## III.    THE CHARGES AND PLEA AGREEMENT

On January 27, 2021, a federal grand jury returned an indictment charging Ehmke with felony Destruction of Government Property in violation of 18 U.S.C. § 1361, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

On January 14, 2022, Ehmke pled guilty to Count One, felony Destruction of Government

Property in violation of 18 U.S.C. § 1361.

## IV.    STATUTORY PENALTIES

Ehmke now faces sentencing on Destruction of Government Property in violation of 18 U.S.C. § 1361. As noted by the plea agreement and the U.S. Probation Office, Ehmke faces up to 10 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count One, Destruction of Government Property.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Ehmke's adjusted offense level under the Sentencing Guidelines as follows:

|  |  |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(2)) | 6 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 26-35.

The U.S. Probation Office correctly calculated Ehmke's criminal history as category I. PSR ¶ 38. Based on a total offense level of 6, after an adjustment for acceptance of responsibility, Ehmke's Guidelines range is 0 to 6 months' imprisonment. Ehmke's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a 4-month term of incarceration.

### A.  Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and

barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at Ehmke's individual conduct, this Court must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Ehmke's crime weigh in favor of a term of imprisonment. Upon approaching the Capitol, Ehmke unlawfully scaled the Rotunda stairs on the East side of the Capitol, near the front of a mob attempting to breach the Capitol at around 2:15 p.m.   Ehmke moved toward a window to the Capitol that was unprotected by the overrun and vastly outnumbered Capitol Police, seemingly seeking another way into the Capitol. An officer observed Ehmke waving his hand to summon others to his position in front of the unguarded window. Ehmke then jumped up on the window ledge and immediately began kicking and punching through the windows.

13

Fortunately, police were able to quickly subdue Ehmke and prevent him from completing a breach of the Capitol and doing any more damage.   Though Ehmke did not enter the Capitol and did leave when directed to do so by police, his destructive acts at the front of the mob contributed to the overall violence and events of January 6. His actions show an overall willingness to engage in destructive conduct and to incite others. He was not merely another member of the crowd that day, nor was he just following the lead of others at the Capitol that day.   Instead, Ehmke avoided the police officers by heading to an unguarded window try to get into the Capitol and encouraged others to follow.

Ehmke did follow police directions after being handcuffed and identified, but this does not erase his destructive actions immediately prior. The seriousness of this offense, including Ehmke's incitement of the mob, warrants a sentence of imprisonment.

### B.  Ehmke's History and Characteristics

Ehmke is a young man who lives with his parents in California. PSR ¶ 47. Ehmke has no criminal history and works for his parents' online business.   In January 2022, he enrolled in Community College.

The government acknowledges the information in paragraphs 55 through 71 of the presentence report and intends to address those issues at the sentencing hearing. The history and characteristics of the defendant must be balanced with his conduct. That conduct warrants Ehmke serving a sentence of imprisonment.

Once at the Capitol, Ehmke was not merely an actor who hung back and followed others into the Capitol. He was an instigator. He led others toward an unguarded potential entry point to the Capitol and began attacking it. These are not the actions of somebody who is simply going

along with others, these are the actions of an adult who can fully function in society and chose to lead a mob toward a potential breach point in the Capitol. This weighs in favor of a term of incarceration, despite the mitigating factors in Ehmke's personal background.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.

Ehmke's criminal conduct, destroying government property in an attempt to breach the Capitol, shows extreme disrespect for the law. When Ehmke entered the Capitol grounds, it would have been abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that an attack on the Capitol is not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

---

[3] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. First, although Ehmke has no criminal history, his actions that day were sufficiently serious that they raise doubts about his willingness to follow the law in the future. Second, although Ehmke left the Capitol area when directed to do so by law enforcement, that came only after he had been apprehended, identified, photographed, and told that a warrant would be issued for his arrest in the future. The fact remains that Ehmke entered a restricted area on January 6, 2021, climbed up the Capitol steps, climbed up onto a window ledge and kicked and smashed out multiple panes. That anyone could think that such conduct was acceptable under any circumstances is shocking. A sentence as proposed by the government will be the best message that this Court can give to the defendant so that he never repeats this conduct.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

17

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court

knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

###### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Ehmke and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1361 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, no other defendant who has been convicted of  felony Destruction of Government Property stemming from the Capitol Siege has been sentenced. Although judges have sentenced Capitol Siege misdemeanor defendants in cases in which there was theft or some destruction of government property, those cases are not apposite to this felony case. *See e.g.,* United States v. Jason Daniel Riddle, Case No. 1:21-cr-00304-DLF (defendant who stole bottle of wine and book from Senate Parliamentarian's Office sentenced to 90 days' incarceration); United States v. Brian McCreary, Case No. 1:21-cr-125-BAH (defendant who witnessed smashing of windows before entering Capitol sentencing to 42 days' intermittent incarceration).

Placing conduct from January 6 on a spectrum, when misdemeanor defendants who stole government property or witnessed the smashing of windows are sentenced to incarceration, it

follows that felony defendants who actually broke or breached windows themselves should have their conduct viewed even more critically.   Ehmke's smashing of the window could have cleared the way for others to enter the Capitol. Seen in this light, a four-month sentence of incarceration does not render an unwarranted sentencing disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[4] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The Architect of the Capitol has estimated that the cost of the damage to the five windowpanes broken by Ehmke is $2,821. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Ehmkle must pay $2,821 in restitution to the Architect of the Capitol, which reflects the damage he did to the Capitol.[5] Plea

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not

Agreement at ¶ 10. Ehmke's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 108.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 4 months, which is a mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,821, a three-year term of supervised release, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Anne Veldhuis*
ANNE VELDHUIS
Trial Attorney, Detailee
CA Bar No. 298491
450 Golden Gate Ave, Rm. 10-0101
San Francisco, CA 94102
Anne.Veldhuis@usdoj.gov
(415) 307-6722

---

qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).